1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Jenessa Dubey,                           No. CV-22-02044-PHX-DJH

10                    Plaintiff,              **ORDER**

11   v.

12   Concentric Healthcare Solutions LLC, et al.,

13                    Defendants.

14

15           Defendant Concentric Healthcare Solutions LLC and Robert Bales ("Defendants")

16   have moved for partial summary judgment on six of Plaintiff Jenessa Dubey's ("Plaintiff")

17   eight claims.  (Doc. 81).  The matter is fully briefed.  (Docs. 82 & 86).  The Court will

18   grant summary judgment for Defendants on Plaintiff's claims for negligent infliction of

19   emotional distress ("NIED"), retaliation, and her whistleblower claim but not on her claims

20   for discrimination, sexual harassment, or intentional infliction of emotional distress

21   ("IIED").

22   **I.      Background[1]**

23           This case centers around years of Defendant's conduct which Plaintiff alleges

24   created a hostile work environment while she was their employee.  Plaintiff worked at

25   Concentric from August 2016 through December 2, 2021—the date she was terminated.

26   (Doc. 81 at 2; Doc. 82 at 7).  In 2017, she was promoted to Account Manager for the Per

27   Diem Nursing division.  (Doc. 82 at 7).  In December of 2019 she was promoted to Director

28   of this division.  (Doc. 81 at 2; Doc. 82 at 8).  In this role, Plaintiff managed several

---

[1] The following facts are undisputed, unless stated otherwise.

employees who were responsible for locating and placing healthcare workers with Concentric's clients in Arizona.  (Doc. 81 at 2).

Shortly after her promotion, Plaintiff claims she was sexually assaulted by one of Concentrics's owners, Chris Bollinger, after a company holiday party.  (Doc. 81 at 2; Doc. 82 at 10).  Defendants admit that Mr. Bollinger went out for drinks after the party and that he complimented Plaintiff's physical appearance, "placed his hand onto her knee and began to run his hand along the top of her thigh," and "grew uncomfortably close to [Plaintiff's] face and kept inching closer to her lips as though to kiss her."  (Doc. 81 at 2–3).  Defendants note that Plaintiff did not report this incident to anyone at Concentric.  (Doc. 81 at 3).

Around May of 2020, Plaintiff noticed that Concentric's Travel Division was assigning Arizona resident nurses with Arizona clients under a "travel contract" in violation of company policy, i.e., that these nurses did not qualify as "travel nurses."  (Doc. 81 at 3; Doc. 82 at 8).  Plaintiff was concerned with this recent development and spoke to Concentric's Vice President, Defendant Bales.  (Doc. 81 at 3; Doc. 82 at 8).  Defendants admit that Defendant Bales accused Plaintiff of not being a team player and "began shouting at Plaintiff," "pounded his fists on the desk," and told Plaintiff "to wipe that look off [her] face."  (Doc. 81 at 3).  Plaintiff alleges in her Complaint that she went from Defendant Bales' office directly to Shannon Riley, her designated human resources ("HR") contact.  Ms. Riley refused to report this conduct to Kyle Silk, Concentric's President, because the previous Vice President had just been dismissed for "similarly unprofessional, bullying and harassing behavior."  (Doc. 1 at ¶ 17).  Defendants have not admitted that this specific event happened in their Motion for Summary Judgment— although they denied this paragraph in their Answer.  (Doc. 10 at 2).

After this event, a recruiter in the Travel Division informed Plaintiff that Nate Belcher—the Travel Division Director—referred to Plaintiff as the "redheaded devil," and stated that "someone should kill her and put her out of her misery."  (Doc. 81 at 3; Doc. 82 at 8).  Belcher encouraged his team to participate in a game of "a hundred ways to kill the

redheaded devil." (*Id.*)  No action was taken when Plaintiff reported Belcher to Human Resources ("HR").  Instead, Defendant Bales told Plaintiff to "forget about it."  (Doc. 81 at 4; Doc. 82 at 8).  Plaintiff also notes that the recruiter who told her of Belcher's comments, threats and the "game" was terminated by Concentric—but Mr. Belcher was not.  (Doc. 1 at ¶ 20).

From the time Plaintiff was promoted to the Director of the Per Diem division, Defendant Bales made multiple comments that, as Concentric's Vice-President, "all divisions need to be under him."  (Doc, 81 at 4; Doc. 82 at 8).  Eventually, in June 2021, Plaintiff began reporting to Defendant Bales.  Defendants note that Defendant Bales began interfering with projects and client contracts Plaintiff had been working on, "preventing her from billing for things she typically billed for, requiring her to pay for things out-of-pocket that were not typical, and inevitably reducing her division's overall profitability and weekly spread and the amount of her overall monthly commissions."  (Doc. 81 at 4-5).

Defendants also admit that Plaintiff was "routinely segregated from the rest of the company and excluded from normal daily interactions" such as being excluded from monthly golf outings where only men were invited or playing fantasy football.  (Doc. 81 at 6).  Once, Plaintiff attempted to speak with Mr. Silk to voice concerns over a meeting she had with Defendant Bales and Ms. Riley, but  "[he] cut Plaintiff off and said, 'why do you have to take everything personally, why are you women so emotional. I'm done with this.' "  (Doc. 81 at 4).

Plaintiff requested and was granted leave under the Family and Medical Leave Act ("FMLA") from November 4 to November 22, 2021.  (Doc. 81 at 6; Doc. 82 at 9).  Upon her return, Plaintiff was "bombarded" with changes such as no longer be permitted to recruit and staff nurses on local jobs.  (Doc. 82 at 9).  Defendant Bales also informed Plaintiff that the Per Diem Nursing division must increase its external staff's hourly wages by $5–10 per hour.  (Doc. 81 at 6).

Plaintiff attempted to meet with one of her team members but was instead issued a corrective action by Defendant Bales.  (Doc. 81 at 7; Doc. 82 at 10).  Defendants admit

that this was the first time that Plaintiff was told that she could not meet with her team members one-on-one.  (Doc. 81 at 7).

The next two days, November 23rd and 24th of 2021, Plaintiff took sick days by texting and calling both Defendant Bales and Ms. Riley.  (Doc. 81 at 7; Doc. 82 at 9). Defendant Bales informed Plaintiff that she did not have any Paid Time Off ("PTO").  (*Id*.) Concentric was closed for Thanksgiving and Plaintiff did not show up for work on November 30, December 1, or December 2 and was ultimately terminated.  (Doc. 81-8 at 3).  Defendants state that Plaintiff did not contact either Defendant Bales or Ms. Riley on any of these days to inform them she would not be at work.  (Doc. 81 at 7).  Plaintiff states that she provided a doctor's note on November 29th to Defendant Bales and Ms. Riley which "excused her absence through at least 'Thursday or Friday' of that week which would have been December 2 or 3, 2021, *if* the illness had then resolved."  (Doc. 82 at 9).

In proximity to her termination, on November 23, 2021, Plaintiff sent an email from her personal email account to the "whistleblower" email address for one of Concentric's clients—The Crisis Prevention Center ("CPI").  (Doc. 81-12 at 2).  Plaintiff stated that Concentric was violating CPI's certification procedures by only holding recertification classes and passing them off as certification classes for nurses who had never completed the CPI course.  (*Id*. at 3).  On the same day as Plaintiff's termination, a representative from CPI, its General Counsel and Chief Compliance Officer, emailed Plaintiff and told her CPI was investigating the situation.  (*Id*. at 2).

Due to the above alleged conduct, Plaintiff has brought the following claims against Defendants: (Count I) Failure to Pay Wages; (Count II) Sex-Based Discrimination in Violation of Title VII; (Count III) Sexual Harassment in Violation of Title VII; (Count IV) Intentional Infliction of Emotional Distress; (Count V) Negligent Intentional Infliction of Emotional Distress; (Count VI) Interference in Violation of the FMLA; (Count VII) Retaliation in Violation of the FMLA; and (Count VIII) Termination in Violation of Public Policy (Whistleblower).  (Doc. 1 at ¶¶ 36–83).  She first filed a Charge of Discrimination

1   with the EEOC on September 23, 2022—294 days after her termination.[2]  (Doc. 81-9 at 2).

2   Defendants seek summary judgment on all but Count I for Failure to Pay Wages and Count

3   VI for Interference in Violation of the FMLA, both of which are alleged solely against

4   Concentric.

5   **II.    Legal Standard**

6          A court will grant summary judgment if the movant shows there is no genuine

7   dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R.

8   Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is "material"

9   if it might affect the outcome of a suit, as determined by the governing substantive law.

10  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine"

11  when a reasonable jury could return a verdict for the nonmoving party.  *Id*.  Courts do not

12  weigh evidence to discern the truth of the matter; they only determine whether there is a

13  genuine issue for trial.  *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th

14  Cir. 1994).  This standard "mirrors the standard for a directed verdict under Federal Rule

15  of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the

16  governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson*,

17  477 U.S. at 250.  "If reasonable minds could differ as to the import of the evidence,

18  however, a verdict should not be directed."  *Id*. at 250–51 (citing *Wilkerson v. McCarthy*,

19  336 U.S. 53, 62 (1949)).

20         The moving party bears the initial burden of identifying portions of the record,

21  including pleadings, depositions, answers to interrogatories, admissions, and affidavits,

22  that show there is no genuine factual dispute.  *Celotex*, 477 U.S. at 323.  Once shown, the

23  burden shifts to the non-moving party, which must sufficiently establish the existence of a

24  genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio

25  Corp.*, 475 U.S. 574, 585–86 (1986).  Where the moving party will have the burden of

26  proof on an issue at trial, the movant must "affirmatively demonstrate that no reasonable

27
28  [2] "Title VII requires that '[a] charge shall be filed by or on behalf of the person aggrieved within three hundred [(300)] days after the alleged unlawful employment practice occurred."  *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1202 (9th Cir. 2016). 300 days prior to Plaintiff's filing of her EEOC charge is: November 27, 2021.

trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail "merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp.*, 477 U.S. at 323).

If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e). The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322. The summary-judgment stage is the " 'put up or shut up' moment in a lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of events." *Arguedas v. Carson*, 2024 WL 253644, at *2 (S.D. Cal. Jan. 22, 2024) (citation omitted). In fact, the non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in [its] favor." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

## III.    Discussion

Defendants seek summary judgment on Plaintiff's claims for: Sex-Based Discrimination, Sexual Harassment, IIED, NIED, Retaliation and Whistleblower Termination. (Doc. 81 at 1). It vastly argues that Plaintiff cannot recover under many of her claims as she failed to timely exhaust her administrative remedies and that she cannot recover for any alleged conduct occurring before December 1, 2020, because she is barred by the applicable statute of limitations. (*Id.* at 11, 14). The Court will first address the timeliness issue.

### A.    Timeliness

As an initial matter, the Court must decide whether some of Plaintiff's claims are time barred.  Defendants argue two issues of timeliness are present here: (1) that Plaintiff failed to timely exhaust her administrative remedies related to her Title VII claims, so, any alleged conduct that occurred before her termination cannot support her claims; and (2) her IIED claim must be dismissed because the alleged conduct which supports this claim is barred by Arizona's two-year statute of limitations.  (Doc. 81 at 11–12, 14).  Plaintiff argues that Defendants have waived their ability to raise a statute of limitation defense because this is the first time they have raised this issue and failed to raise it as an affirmative defense in their Answer.  (Doc. 82 at 11).  She also argues that the continuing tort doctrine allows the Court to consider events that would otherwise be time-barred.  (*Id*. at 21).

The Court finds that Defendants have waived their ability to assert their statute of limitations defense.  Alternatively, the Court finds that this conduct, even if it were barred by the applicable statute of limitations, is relevant to Plaintiff's claims based on her termination.

### 1.    Defendants Waived their Statute of Limitations Defense

A defendant can waive its right to assert an affirmative defense. *See, e.g., Day v. McDonough*, 547 U.S. 198, 207-08 (2006) (waiver of statute of limitations defense).  A "waiver" is the "intentional relinquishment or abandonment of a known right." *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (citations and internal quotation marks omitted). Generally, an affirmative defense that is not asserted in an answer to the complaint is waived or forfeited by the defendant. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008) (citing Fed. R. Civ. P. 8(c)(1), 12(b), 15(a)).  Though affirmative defenses like the statute of limitations may "be raised in motions to dismiss filed before the first responsive pleading." *Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999) (citing *Bacon v. City of Los Angeles*, 843 F.2d 372 (9th Cir. 1988).

Federal Rule of Civil Procedure 7(a) defines "pleadings" as "a complaint and answer; a reply to a counterclaim; an answer to a cross-claim; and a third party complaint and answer. Anything else is a motion or paper." *Morrison v. Mahoney*, 399 F.3d 1042,

1046 (9th Cir. 2005). "The requirement in Rule 8(c) that a party set forth the affirmative defenses listed in that rule applies only to responsive 'pleadings,' not to motions." *Id.* "Federal Rules of Civil Procedure 8(c) and 12(b) **require** that the [defendant] raise the statute of limitations in its first responsive pleading to avoid waiving the defense." *Id.* (citation omitted) (emphasis added). "In the absence of a showing of prejudice, however, affirmative defenses may be raised for the first time at summary judgment." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993); *see also Control Laser Corp. v. Smith*, 705 F. Supp. 3d 1006, 1017 (N.D. Cal. 2023) (noting same).

Plaintiff argues that Defendants delay in asserting this defense prejudices her because "Defendants inexplicably sat on this defense for *years*, only to ambush Plaintiff with this argument now." (Doc. 82 at 12). She also argues that "[h]ad Plaintiff known Defendants would raise this defense, she would have requested discovery that focused on the continuing nature of the wrongful conduct. And she would have deposed individuals who witnessed such conduct on a routine and continuous basis." (*Id.*) Finally, she states that this is the form of prejudice the Ninth Circuit seeks to prevent. (*Id.* (citing *Lockheed Martin Corp. v. Network Solutions, Inc*., 194 F.3d 980, 986 (9th Cir. 1999) ("[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice.")). Defendants argue in their Reply that Plaintiff "*did* have the opportunity to conduct discovery" on its untimeliness defense because Defendants supplemented their disclosure statement on January 23, 2024, to inform Plaintiff that they intended to raise this defense. (Doc. 86 at 2).

Indeed, Defendants' Third Supplemental Rule 26 Disclosure, submitted on January 23, 2024, discloses their potential statute of limitations defense based on the date which Plaintiff filed her EEOC Charge. Defendants' disclosure states that:

> Plaintiff has information regarding her employment with Concentric the allegations in her Complaint. ***Plaintiff also has information relevant to Concentric's defenses, including but not limited to the statute of limitations, as she has information regarding the date on which she filed her EEOC Charge of Discrimination and the dates on which the alleged acts occurred that form her hostile work environment claim.*** Plaintiff also

> has information relevant to her failure to exhaust administrative remedies with respect to her claim for negligent infliction of emotional distress due to her failure to submit a claim for workers' compensation.

(Doc. 86-1 at 3) (emphasis added). The Court's Scheduling Order was amended several times throughout the course of this matter. Relevant here, the parties' fact discovery deadline was extended to February 29, 2024. (Doc. 49 at 3). The Court also noted that "[a]ll depositions shall be scheduled to commence at least **five working days** prior to the discovery deadline" and that written discovery, including "[a]ll interrogatories, requests for production of documents, and requests for admissions shall be served at least **45 days** before the discovery deadline." (*Id.*)

Although thirty-seven days remained until the parties' fact discovery deadline closed, Defendants made their Rule 26 disclosure *after* the forty-five-day deadline in which to conduct written discovery. (*Compare* Doc. 86-1 at 3 *with* Doc. 49 at 3). So, while Defendants disclosed an intent to assert a timeliness defense, they did so too late for Plaintiff to request written discovery on this newly asserted defense. If Plaintiff wanted to "request[] discovery that focused on the continuing nature of the wrongful conduct[,]" as she argues she would have, then the Court's Scheduling Order would have precluded her request. (*See* Doc. 49 at 3). Defendants' belated statute of limitation defense has resulted in prejudice to the Plaintiff by preventing her from requesting potentially necessary, useful, written discovery to counter the assertion. *See Camarillo*, 998 F.2d at 639; *Control Laser Corp.*, 705 F. Supp. 3d at 1017; *see also Lockheed Martin*, 194 F.3d at 986 (stating that "[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice.").

Additionally, the Ninth Circuit has held that "[t]here is no prejudice to a plaintiff where an 'affirmative defense would have been dispositive' if asserted 'when the action was filed.' " *Garcia v. Salvation Army*, 918 F.3d 997, 1008 (9th Cir. 2019) (quoting *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 713 (9th Cir. 2001)). While the statute of limitation defense can be dispositive in many cases, it is not dispositive here because Defendants have admitted that there is conduct that would not be covered by the applicable

statute—such as Plaintiff's termination.  (Doc. 81 at 9 ("to the extent Plaintiff bases her sex discrimination claim on other adverse employment actions taken by Defendants (**besides termination**), those claims are barred because Plaintiff failed to timely exhaust her administrative remedies.") (emphasis added)).

Thus, the statute of limitations defense only serves to preclude evidence of certain conduct that supports Plaintiff's claims, not the claim itself; so, Defendants cannot raise this defense for the first time at summary judgment without prejudicing Plaintiff.  *Cf. Aponte v. Mason Cnty. Fire Prot. Dist. No 16*, 641 F. Supp. 3d 1016, 1025 (W.D. Wash. 2022) (finding no prejudice to the plaintiffs where they did not state what type of additional discovery they would need to conduct and the applicable affirmative defense (exemptions to the categorization of employees under the FLSA) would be dispositive to the plaintiffs' claims).

### 2.    The Court Can Also Consider Prior Acts as Background Evidence

Even if the Defendants had not waived their statute of limitations defense, the Court could still consider the vast amount of evidence Plaintiff has provided as background evidence.  With respect to Plaintiff's sex discrimination claim and retaliation claims, the Supreme Court has "observed that '[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' "  *Pearson v. Reynolds Sch. Dist. No. 7*, 998 F. Supp. 2d 1004, 1019 (D. Or. 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114  (2002).  However, the Supreme Court has also noted that:

> The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  ***Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim***.

*Morgan*, 536 U.S. at 113 (emphasis added).  So, even if the statute of limitations prevented Plaintiff from asserting claims for discrete acts which occurred prior to November 27,

1    2021, the Court could still consider "background evidence" of non-discrete acts which

2    support Plaintiff's timely filed claim related to her termination.  *See id.*; *see also Porter v.*

3    *California Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) ("discrete acts still may be

4    considered for purposes of placing non-discrete acts in the proper context.").

5           Moreover, specifically related to Plaintiff's hostile work environment sexual

6    harassment claim, prior conduct can be considered as part of "an ongoing unlawful

7    employment practice." *Pearson v. Reynolds Sch. Dist. No. 7*, 998 F. Supp. 2d 1004, 1019

8    (D. Or. 2014).  Under "the continuing violations doctrine," the Court may consider events

9    occurring outside the limitations period if the untimely incidents are part of an ongoing

10   unlawful employment practice.  *See Draper v. Coeur Rochester, Inc*., 147 F.3d 1104, 1107

11   (9th Cir. 1998) (citation omitted).  This is because "the actions causing a hostile work

12   environment sometimes occur over a series of days, or even years, and the discrete acts

13   resulting in a hostile environment may not be actionable on their own, but become

14   actionable based on their cumulative effect." *Pearson*, 998 F. Supp. 2d at 1019.  In short,

15   "consideration of the ***entire scope*** of a hostile work environment claim, ***including behavior***

16   ***alleged outside the statutory time period***, is permissible for the purposes of assessing

17   liability, so long as an act contributing to that hostile environment takes place within the

18   statutory time period." *Id*. (quoting *Morgan*, 536 U.S. at 105) (emphasis added).

19          Regarding Plaintiff's IIED claim, the Court can review this evidence as background

20   evidence like the evidence of discrimination. *Morgan*, 536 U.S. at 113.  Plaintiff argues

21   that the evidence of a "toxic work environment whereby she was subjected to continuous

22   and constant harassment, discrimination and hostility from 2017 through termination in

23   2021" supports her IIED claim. (Doc. 82 at 21).  Some of this conduct occurred outside of

24   Arizona's two-year statutory limitations period. *See London-Marable v. Boeing Co*., 2008

25   WL 2559404, at *6 (D. Ariz. June 23, 2008), *aff'd*, 357 F. App'x 61 (9th Cir. 2009).

26          Under the continuing violation doctrine, "when a long series of closely-related

27   cumulative acts—any of which likely was insufficient by itself to support the claim—form

28   the basis of liability, the 'limitations period on such a claim does not begin to run until the

alleged tortious acts have ceased.' " *D'Agostino v. Comenity Cap. Bank*, 2024 WL 5187695, at *10 (D. Ariz. Dec. 20, 2024) (quoting *Watkins v. Arpaio*, 367 P.3d 72, 75–76 (Ariz. Ct. App. 2016)).   "It does not matter if some of the component acts fall outside the statutory time period; as long as 'an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for purposes of determining liability.' " *London-Marable*, 2008 WL 2559404, at *6 (quoting *Morgan*, 536 U.S. at 103).  However, other courts within this district have found that "the continuing violation doctrine is not applicable to IIED claims in Arizona."  *D'Agostino*, 2024 WL 5187695, at *10 (quoting *London-Marable*, 2008 WL 2559404, at *6 ("Extreme and outrageous acts comprising a claim for IIED have been held to constitute separate and distinct torts, and not a continuing violation.")).  But "no Arizona appellate court has [affirmatively] addressed the issue." *Watkins v. Arpaio*, 367 P.3d 72, 75 (AZ. Ct. App. 2016).  In any event, similar to Plaintiff's discrimination claim, the Court may, at the very least, consider prior acts as background evidence in support of a timely filed claim. *Morgan*, 536 U.S. at 113; *see also Watkins*, 367 P.3d at 77 (noting that the plaintiff needed evidence that the defendant committed an act within a year of the complaint that would support his IIED claim).

In sum, Defendants have waived their statute of limitations affirmative defense.  So, the Court will consider all the conduct which Plaintiff argues in support of her claims.

**B.      Count II -Sex Based Discrimination**

Defendants argue that Plaintiff cannot prevail on her gender discrimination claim because no reasonable jury could conclude that Plaintiff was terminated on the basis of her sex from the evidence which she has provided.  (Doc. 81 at 9).  Defendants specifically argue that Plaintiff cannot establish a prima facie case of discrimination, and that even if she could, she cannot meet her burden of persuasion.  (*Id.* at 10–11).

Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1).  The *McDonnell Douglas* burden-shifting

framework requires three steps.  411 U.S. at 802–04.  First, the plaintiff must establish a prima facie case of discrimination.  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004).  Next, if the plaintiff succeeds in doing so, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct."  *Id*.  If the defendant provides such a reason, "the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination."  *Id*.

### 1.   Plaintiff's Prima Facie Claim

Defendants first argue that Plaintiff cannot demonstrate that "similarly situated men were treated more favorably, or [that] her position was filled by a man."  (Doc. 81 at 10).  Plaintiff argues that "[t]he evidence in this case warrants denial of the Motion under either of these tests."  (Doc. 82 at 13).

A plaintiff can demonstrate a prima facie discrimination claim through either (1) the framework set forth in *McDonnell Douglas*; or (2) with direct or circumstantial evidence of discriminatory intent.  *See Vasquez*, 349 F.3d at 640.  Under *McDonnell Douglas*, unlawful discrimination is presumed if the plaintiff can show that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for h[er] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside h[er] protected class were treated more favorably."  *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir. 2021) (quoting *Fonseca v. Sysco Food Servs. of Ariz., Inc*., 374 F.3d 840, 847 (9th Cir. 2004)).

On summary judgment, direct evidence of discrimination is "that which, 'if believed, proves the fact [of discriminatory animus] without inference or presumption.' " *Hittle v. City of Stockton, California*, 76 F.4th 877, 888 (9th Cir. 2023) (quoting *Coghlan v. Am. Seafoods Co*., 413 F.3d 1090, 1095 (9th Cir. 2005)).  "Direct evidence comprises 'conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.' " *Brown v. Alaska Airlines, Inc*., 2024 WL 2325058, at *5 (W.D. Wash. May 22, 2024) (quoting *Enlow v.*

*Salem–Keizer Yellow Cab Co., Inc*., 389 F.3d 802, 812 (9th Cir. 2004)).  "Such evidence is usually composed of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id*. (internal quotations and citation omitted).  Furthermore, circumstantial evidence of discrimination "must be 'specific' and 'substantial.' " *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015).

Plaintiff has presented substantial direct and circumstantial evidence that demonstrates discriminatory animus without inference or presumption.  *See Hittle*, 76 F.4th at 888.  For example, when Plaintiff went to Mr. Silk to voice concerns over a meeting she had with Defendant Bales and Ms. Riley, Mr. Silk "cut Plaintiff off and said, 'why do you have to take everything personally, why are you women so emotional. I'm done with this.' " (Doc. 81 at 4).  Plaintiff also asserts that women at Concentric were excluded from things like monthly golf outings, fantasy football, and that male supervisors would discuss her division among themselves.  (*Id*. at 6).  Defendants also admit that "comments about Plaintiff's appearance were made 'nearly every day,' such as comments about Plaintiff not wearing high heels and not having her nails done." (*Id*. at 5).  These comments and conduct require no inference that Mr. Silk and other Concentric executives had a negative attitude toward women—the evidence itself illustrates such an attitude.  *See Lalau v. City & Cnty. of Honolulu*, 938 F. Supp. 2d 1000, 1013 (D. Haw. 2013) (noting that comments towards the plaintiff's race illustrate discriminatory animus).

In fact, the comment regarding women being "so emotional" establishes direct evidence of discriminatory animus by itself.  *See Chuang v. Univ. of Cal. Davis Bd. of Trustees*, 225 F.3d 1128 (9th Cir. 2000) (noting that direct evidence of discriminatory motive need not be substantial and may be "very little" to create a triable issue).  A supervisor's comment that "patently reveals a discriminatory mindset is not 'stray' in the context of an employment discrimination action.  Indeed, the comment need not even be made in the direct context of an adverse employment decision to establish discrimination." *Lalau*, 938 F. Supp. 2d at 1013 (quoting *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 153 (2000)).

Furthermore, Plaintiff's termination itself raises factual issues as Ms. Riley confirmed during her deposition that: (1) employees are supposed to call or text to call out sick, (2) a text, call and e-mail would be an appropriate way to call out to avoid termination, and (3) no one at Concentric has ever been terminated on the basis of a  no-call, no-show for leaving a voicemail as a  call-out method.  (Doc. 86-4 at 5–7).  These admissions, coupled with the other conduct Plaintiff suffered while at Concentric, demonstrate specific and substantial instances of discriminatory animus towards Plaintiff.  *France*, 795 F.3d at 1175.  In sum, Plaintiff has demonstrated a prima facie discrimination claim through direct and circumstantial evidence of discriminatory intent.  *See Vasquez*, 349 F.3d at 640.

### 2.    Defendants' Legitimate, Nondiscriminatory Explanations

Moving to the second step of the *McDonnell Douglas* framework, Concentric must provide a legitimate, nondiscriminatory reason for Plaintiff's termination.  *Chuang*, 225 F.3d at 1123–24.  "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1193 (9th Cir. 2003) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

Defendants state that Plaintiff was terminated because she missed six consecutive workdays without available PTO, and Plaintiff did not contact Defendant Bales or Ms. Riley on any of the last three workdays she missed.  (Doc. 81 at 11).  They state that Concentric employees are not permitted to call off work without advanced permission unless they have available PTO.  (*Id*.)  Plaintiff argues that her termination cannot be legitimate as she notified Defendants that she was out sick in a proper and accepted method. (Doc. 82 at 17).

Leading up to her termination, Plaintiff took two sick days on November 23rd and 24th of 2021 by texting and calling both Defendant Bales and Ms. Riley—a procedure Ms. Riley testified had always been an acceptable method of calling out sick.  (Doc. 81 at 7; Doc. 82 at 9).  She did not show up for work on November 30th, December 1st, or

December 2nd either and was ultimately terminated.  (*Id.*)  Defendants state that Plaintiff did not contact either Defendant Bales or Ms. Riley on any of these days to inform them she would not be at work.  (Doc. 81 at 7).  Plaintiff states that she provided a doctor's note on November 29th to Defendant Bales and Ms. Riley which "excused her absence through at least 'Thursday or Friday' of that week which would have been December 2nd or 3rd, 2021, *if* the illness had then resolved.  (Doc. 82 at 9).

The relevant portion of Concentric's leave policy states that:

We encourage all eligible Employees to use their time to spend with the families and friends outside of work. In addition to vacation time, PTO is designed for personal sickness, family sickness, family activities and extra holiday time. In the case of emergencies or sick leave of more than three days, ***a PTO Request form must be filled out <u>once the Employee returns to work</u>***.

. . .

All Employees play an important role in getting the job done. Therefore, each Employee is expected to be at his or her work station on time each day prepared to start work. Absenteeism and tardiness, even for good reasons, disrupt our ability to meet our clients' needs. Excessive absenteeism or tardiness (two incidents of absence and/or tardiness within a thirty (30) day period), excused or unexcused, can result in discipline, up to and including termination. If you are going to be late or absent from work for any reason, then you must notify your supervisor as far in advance as possible and, at a minimum, you must notify your supervisor prior to the start of the workday for which you are late or absent. Where a situation arises in which prior notice cannot be given, you are expected to notify your supervisor as soon as possible. You must personally contact your supervisor, leaving a message does not qualify as "notice" and it is not acceptable to leave a message or send an e-mail or text message notification of your absence. If you are required to leave work early, then you must also personally contact your supervisor and obtain his/her permission.

Concentric will comply with applicable laws relating to time off from work, but it is the Employee's responsibility to provide sufficient information to enable the Company to determine whether such law(s) applies to their absence. If two or more consecutive unscheduled absences occur due to illness, a physician's note is required. If two or more consecutive unscheduled absences occur due to a family illness and/or incident, then proof of the illness and/or incident must be provided. ***Once you return to work, you must complete a PTO request form and submit it to your***

*supervisor for approval and once approved, it must be submitted to payroll.* <u>***Except in extraordinary circumstances, any Employee who does not report to work and who does not personally speak directly with his or her supervisor for two consecutive days will be considered to have abandoned his or her job and will be removed from payroll***</u>.

(Doc. 81-10 at 11–12, 18–19) (emphasis added).

Defendant Concentric has provided a legitimate, nondiscriminatory reason for terminating Plaintiff. Its policy requires employees to "personally speak" with their supervisor every two consecutive days when taking PTO or sick leave. (Doc. 81-10 at 19). While Plaintiff submitted a doctor's note on November 29th to Defendant Bales and Ms. Riley, under Concentric's policy, this does not excuse her from this requirement. Rather, the doctor's note is a separate part of the policy—a requirement for employees who take two or more consecutive unscheduled absences. (*Id*.) Furthermore, the policy also states that "leaving a message does not qualify as 'notice' and it is not acceptable to leave a message or send an e-mail or text message notification of your absence." (*Id*. at 18). Instead, employees must "personally contact" their supervisor. (*Id*.)

It is the burden of production—not persuasion—that shifts to Concentric at this second step. *Chuang*, 225 F.3d at 1123–24. The Court finds that Defendant Concentric has met this burden. Because Concentric has met its low burden, the presumption of discrimination "drops out of the picture." *McGinest*, 360 F.3d at 1123 (quoting *Reeves*, 530 U.S. at 143). Now, Plaintiff must show that Concentric's proffered reasons are pretextual to survive summary judgment.

### 3.    Pretext

Plaintiff must now "raise a genuine factual question whether, viewing the evidence in the light most favorable to her, [Concentric's] proffered reasons are pretextual." *Raad*, 323 F.3d at 1193 (citing *Chuang*, 225 F.3d at 1126). She may demonstrate pretext "in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not

believable." *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 928 (E.D. Cal. 2013) (internal quotations omitted).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that she has raised a genuine fact question as to whether Concentric's proffered reasons for her termination are pretextual. *See Raad*, 323 F.3d at 1193. While the policy mandates that employees "personally speak" with their supervisor, Ms. Riley stated during her deposition that: (1) employees are supposed to call or text to call out sick, (2) a text, call and e-mail would be an appropriate way to call out to avoid termination, and (3) ***no one at Concentric has ever been terminated on the basis of a no-call, no-show for leaving a voicemail as a call-out method***. (Doc. 86-4 at 5–7). Furthermore, Defendant Bales also testified that employees who do not have any PTO are allowed to call out—but that they would not receive pay for this time. (Doc. 82-5 at 7). This evidence creates a genuine factual question about Concentric's proffered explanation for Plaintiff's termination as its reasoning is inconsistent with how the policy was applied internally. *See Yeager*, 944 F. Supp. 2d at 928; *see also Kranson v. Fed. Ex. Corp.*, 2012 WL 4715337, at *9 (N.D. Cal. Oct. 1, 2012) (refusing to grant summary judgment where employer applied its discretionary policy to the employee and the court was unable to find as a matter of law that the application of the policy was non-discriminatory).

In sum, entering summary judgment for Defendants on Plaintiff's discrimination claim would be improper because doing so would require the Court to make credibility determinations or weigh conflicting evidence—which is improper at this stage. *See T.W. Electric Service, Inc.*, 809 F.2d at 630-31. Thus, Plaintiff's discrimination claim survives.

## C.    Count III - Hostile Work Environment – Sexual Harassment

Defendants also argue that Plaintiff has not presented (and cannot present) any evidence that she was subjected to a hostile work environment on the basis of sexual harassment, following the last day she attended work on November 22, 2021. (Doc. 81 at 13). Defendants note that Plaintiff "cannot" present evidence to support her sexual harassment claim because the alleged conduct supporting this claim falls outside of the

1    statute of limitations period. (*Id.*) Plaintiff however argues that the hostile acts were

2    continuous through Plaintiff's termination, so, she has demonstrated a prima facie hostile

3    work environment claim despite any timeliness issues. (Doc. 82 at 19). The Court agrees

4    with Plaintiff.

5         The Court has addressed the timeliness issue and found that Defendants waived their

6    ability to raise the statute of limitations defense. *See supra* Section III.A. Even if it hadn't,

7    however, a sexual harassment claim allows for prior conduct to be considered as part of

8    "an ongoing unlawful employment practice" and events occurring outside the limitations

9    period can be considered under the continuing violations doctrine. *Pearson*, 998 F. Supp.

10   2d at 1019; *Draper*, 147 F.3d at 1107.

11        To prevail on a Title VII hostile work environment claim, whether for gender or

12   race, a plaintiff must show: (1) he was subjected to verbal or physical conduct of a sexual

13   nature or because of race; (2) this conduct was unwelcome; and (3) this conduct was

14   sufficiently severe or pervasive to alter the conditions of employment and create an abusive

15   working environment. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir.2003); *Little*

16   *v. Windermere Relocation, Inc*., 301 F.3d 958, 966 (9th Cir.2001). "To prevail on a hostile

17   work environment sexual harassment claim, the plaintiff must show that her work

18   environment was both subjectively and objectively hostile; that is, she must show that she

19   perceived her work environment to be hostile, and that a reasonable person in her position

20   would perceive it to be so." *Dominguez–Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034

21   (9th Cir. 2005). "A hostile work environment claim is composed of a series of separate

22   acts that collectively constitute one 'unlawful employment practice.' " *Morgan*, 536 U.S.

23   at 117.

24        Considering the evidence as a series of separate acts that collectively constitute one

25   unlawful employment practice, Plaintiff easily meets her burden. *Morgan*, 536 U.S. at 117.

26   Defendants admit that in 2019 Mr. Bollinger, one of Concentric's owners, sexually

27   assaulted Plaintiff by "plac[ing] his hand onto her knee and [running] his hand along the

28   top of her thigh," and "grew uncomfortably close to [Plaintiff's] face and kept inching

1    closer to her lips as though to kiss her." (Doc. 81 at 2–3). In 2020, Mr. Belcher would

2    refer to Plaintiff as the "redheaded devil." (*Id*. at 3). When Plaintiff complained of

3    Belcher's comments regarding killing Plaintiff, Defendant Bales refused to act and told

4    Plaintiff to "forget about it." (Doc. 81 at 4; Doc. 82 at 8). Furthermore, Plaintiff alleges

5    that the employee who told Plaintiff about Belcher's conduct was swiftly terminated, but

6    not Belcher. (Doc. 1 at ¶ 20).

7         Moreover, in 2021, Plaintiff and other women at Concentric were "routinely

8    segregated from the rest of the company and excluded from normal daily interactions" such

9    as being excluded from monthly golf outings or playing fantasy football, where only men

10   were invited. (Doc. 81 at 6). Defendants also admit that Belcher made fun of Plaintiff's

11   weight from 2017 through 2019. (*Id*. at 5). They also admit that "comments about

12   Plaintiff's appearance were made 'nearly every day,' [including up to November 22, 2021,]

13   such as comments about Plaintiff not wearing high heels and not having her nails done."

14   (*Id*.)

15        The collective evidence more than demonstrates that Plaintiff's work environment

16   was both subjectively and objectively hostile. *Dominguez–Curry*, 424 F.3d at 1034.

17   Simply put: if this evidence is not enough to demonstrate a hostile work environment claim,

18   no such claim would ever survive summary judgment.

19        **D.    Count IV - Intentional Infliction of Emotional Distress**

20        Under Arizona law, the tort of IIED requires proof of three elements: " '[F]irst, the

21   conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must

22   either intend to cause emotional distress or recklessly disregard the near certainty that such

23   distress will result from his conduct; and third, severe emotional distress must indeed occur

24   as a result of defendant's conduct.' " *Demetrulias v. Wal-Mart Stores Inc*., 917 F.Supp.2d

25   993, 1012 (D. Ariz. 2013) (quoting *Ford v. Revlon, Inc*., 734 P.2d 580, 585 (1987)) (citing

26   Restatement (Second) of Torts § 46(1) (1965)). "The adjectives 'extreme' and

27   'outrageous' are not just for show; evidence of [mere] callousness or insensitivity will not

28   suffice." *Id*. (citation omitted). "The question of whether the acts complained of by a

plaintiff are sufficiently extreme or outrageous is answered by the court." *Id.* (citation omitted); *see also Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 118 Ariz. 473, 476 (1978) (citation omitted) ("It is the duty of the court as society's conscience to determine whether the acts complained of can be considered sufficiently extreme and outrageous to state a claim for relief.").

On the first element, "[t]he 'conduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct.' " *Matson v. Safeway*, 2013 WL 6628257, at *4 (D. Ariz. Dec. 17, 2013) (quoting *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 258 (1980)). To satisfy this element, "[t]he plaintiff must show that the defendant's acts were 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Demetrulias*, 917 F.Supp.2d at 1012 (quoting *Mintz*, 183 Ariz. at 554). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Coffin v. Safeway, Inc.*, 323 F. Supp. 2d 997, 1003 (D. Ariz. 2004) (quoting *Lucchesi v. Stimmell*, 716 P.2d 1013, 1016 (Ariz. 1986).

Because the terms "outrageous conduct" and "severe emotional distress" evade precise legal definition, courts in Arizona analyze these elements on a case-by-case basis. *See id*. "One factor used by courts to analyze these terms is the 'position occupied by the defendant.' " *Id*. (quoting Restatement (Second) of Torts § 46). "[T]he extreme and outrageous character of conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Id*.

Defendants argue that its conduct was not "extreme" or "outrageous" such that Plaintiff can maintain an IIED claim against them. (Doc. 81 at 15). The Court does not agree.

Plaintiff points to many instances of conduct it avers are extreme and outrageous, including: discrimination, sexual assault, hostile comments, and "calls for her murder."

(Doc. 82 at 23). Indeed, from the record before it, the Court finds the following conduct could be considered extreme and outrageous by a finder of fact:

- Nate Belcher referring to Plaintiff as the "redheaded devil" and stating that "someone should ***kill her and put her out of her misery***." (Doc. 81 at 3; Doc. 82 at 8) (emphasis added).
- Belcher encouraging his team to participate in a game where they would attempt to come up with "a hundred ways to kill the redheaded devil." (*Id.*)
- Plaintiff reported Belcher to HR. Instead, Defendant Bales told Plaintiff to "forget about it" (Doc. 81 at 4; Doc. 82 at 8).
- Plaintiff's routine segregation from the rest of the company. (Doc. 81 at 6).
- Mr. Bollinger's sexual assault of Plaintiff. (Doc. 81 at 2–3).
- Defendant Bales "shouting at Plaintiff," "pound[ing] his fists on the desk," and telling Plaintiff "to wipe that look off [her] face" in response to concerns over her placements being reassigned. (Doc. 81 at 3).
- Ms. Riley's repeated inaction when Plaintiff made complaints. *See Revlon, Inc.*, 734 P.2d at 586 (holding that "failure to take appropriate action in response to [a] complaint of sexual harassment by [a supervisor] constituted the tort of intentional infliction of emotional distress.").
- The "near every day" comments about Plaintiff's appearance. (Doc. 81 at 5).
- Bales issuance of a corrective action to Plaintiff upon her attempt to meet with a team member where Plaintiff had not been previously told that this was prohibited. (Doc. 81 at 7; Doc. 82 at 10).

These instances of conduct, in the aggregate or by themselves, are "beyond all possible bounds of decency." *Demetrulias*, 917 F.Supp.2d at 1012. While Plaintiff's case is, in part, an employment dispute—the conduct alleged here goes "far beyond what is described in [the average] employment dispute[]." *Cf. Matthews v. City of Tempe*, 2023 WL 6880652, at *6 (D. Ariz. Oct. 18, 2023) (granting summary judgment against a pro se plaintiff where he alleged the defendant failed to adhere to internal policies, was untruthful in discovery responses, and altered documents for the purpose of terminating him). This is not the usual employment dispute case. At the bare minimum, reasonable minds could differ about whether the above-alleged conduct is sufficiently extreme and outrageous to support an IIED claim, so, dismissal on this basis is inappropriate. *See Thorp v. Home Health Agency–Arizona, Inc.*, 941 F. Supp. 2d 1138, 1142 (D. Ariz. 2013) (citing *Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994)).

1    Though Defendants do not address the second or third IIED elements, the Court

2 finds that these elements are also easily met through the evidence in the record.  Plaintiff

3 has demonstrated Defendants either intended to cause Plaintiff emotional distress or

4 recklessly disregarded the near certainty that such distress would result from their conduct

5 such as the repeated inaction when Plaintiff made complaints as well as the continues

6 nature of the bullying and harassment she faced. *See Demetrulias*, 917 F.Supp.2d at 1012.

7 Plaintiff has also demonstrated that severe emotional distress indeed occurred because of

8 Defendants' conduct—the third element of an IIED claim.  *See id.*  For example, Dr.

9 William Flynn, a clinical and forensic psychologist, evaluated Plaintiff and found that she

10 "has all the signs of an anxiety disorder and a major depressive disorder ***that was caused***

11 ***by her employment experiences at Concentric***. Jenessa cries, paces, has a sleep disorder,

12 obsessive thoughts and suicidal thoughts."  (Doc. 82-10 at 4) (emphasis added).

13    In sum, Plaintiff has demonstrated a prima facie IIED claim, so, the Court cannot

14 enter summary judgment on this claim given the conduct showing that there are genuine

15 issues for trial.  *See Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e).

16    **E.    Count V- Negligent Infliction of Emotional Distress**

17    Defendants next argue that Plaintiff's NIED claim is barred by Arizona's workers'

18 compensation statutes and that Plaintiff cannot demonstrate a prima facie NIED claim.

19 (Doc. 81 at 17).  Plaintiff argues that her NIED claim is not precluded because Defendant

20 Bales is an individual and because worker's compensation does not cover claims stemming

21 from a company's illegal activities.  (Doc. 82 at 24 (citing *Martinez v. Costco Wholesale*

22 *Corp.*, 481 F. Supp. 3d 1076, 1102 (C.D. Cal. 2020)).

23    "Under Arizona law, a plaintiff has a cognizable NIED claim against another if (1)

24 the tortfeasor should have realized that his conduct involved an unreasonable risk of

25 causing distress, and (2) from facts known to him should have realized that the distress, if

26 it were caused, might result in illness or bodily harm."  *Eichenberger v. Falcon Air Exp.*

27 *Inc.*, 2014 WL 3819355, at *4 (D. Ariz. Aug. 4, 2014) (citing *Ball v. Prentice*, 781 P.2d

28 628, 630 (Ariz. Ct. App. 1989)).  Arizona federal courts have "applied the NIED cause of

action to encompass employment cases." *Id.* (citing *Carboun v. City of Chandler*, 2005 WL 2408294, at *12 (D. Ariz. Sept. 27, 2005)).  However, the workers' compensation statute "provides the exclusive remedy for injuries sustained by an employee against the employer or a co-employee acting within the scope of his or her employment." *Id.* (citing A.R.S. § 23–1022(A)).  Though, "[t]here is a willful misconduct exception in A.R.S. § 23–1022(A), but this exception [only] applies when the employee's injury is caused by the employer's 'willful misconduct,' which is defined as 'an act knowingly and purposely with the direct object of injuring another.' " *Id.* at *5 (quoting A.R.S. §§ 23–1022(A) & 23–1022(B)).  Article XVIII, § 8, of the Arizona Constitution allows employees to "*either* claim compensation or maintain an action at law for damages against the person or entity alleged to have engaged in the willful misconduct." *Gamez v. Brush Wellman, Inc*., 34 P.3d 375, 378 (AZ. Ct. App. 2001).[3]  The NIED must still be "sufficiently severe that 'physical harm develops as a result of plaintiff's emotional distress.' " *Eichenberger*, 2014 WL 3819355, at *4 (quoting *DeStories v. City of Phoenix*, 744 P.2d 705, 709 (Ariz. Ct. App. 1987).

The question for the Court, then, is two-fold: (1) whether the willful misconduct exception applies, and (2) if it does, is the alleged conduct supporting the NIED sufficiently severe such that physical harm has developed because of Plaintiff's emotional distress.

In Arizona, a willful misconduct action includes four elements: "(1) the employer's wilful misconduct must have been the cause of the employee's injury, (2) the wilful misconduct must have been 'an act done . . . knowingly and purposely with the direct object of injuring another,' (3) the act that caused the injury must have been the personal act of the employer, and (4) the act must have reflected 'a wilful disregard of the life, limb or bodily safety of employees.' " *Gamez*, 34 P.3d at 378 (quoting Ariz. Const. art. XVIII, § 8; *Serna v. Statewide Contractors, Inc*., 429 P.2d 504 (1967)).  To say that the willful misconduct exception is a high burden would be an understatement.  In fact, "***in the***

---

[3] Neither party asserts whether Plaintiff claimed worker's compensation after she was terminated, (*see* Docs. 81–82), though Defendants submitted evidence that Plaintiff sought worker's compensation for a fall in 2019.  (Doc. 81-11 at 2).

1    *roughly one hundred years since Arizona adopted workers' compensation*, **no reported**

2    **case has determined that an employer engaged in wilful misconduct**." *Haro v. Solterra*

3    *Team Servs., LLC*, 2024 WL 4586197, at *4 (Ariz. Ct. App. Oct. 25, 2024).

4            For this exception to apply, "[t]he 'direct object' of the employer's actions must

5    have been to 'injur[e] another.' " *Id*. (quoting A.R.S. § 23–1022(B)). "Even if the alleged

6    conduct goes beyond aggravated negligence, and includes such elements as . . . knowingly

7    ordering employees to perform an extremely dangerous job, wilfully failing to furnish a

8    safe place to work . . . the conduct still falls short of the kind of actual intention to injure

9    that robs the injury of accidental character." *Id*. (quoting 6 Arthur Larson & Lex K. Larson,

10   *Larson's Workers' Compensation Law* § 103.03 at 103–07 (2001)). "Arizona law is clear

11   that willful misconduct requires something more than negligent or even grossly negligent

12   behavior: **the 'direct object' of the conduct must have been to 'injur[e] another.' "**

13   *Perkins v. Emps. Mut. Cas. Co*., 507 F. Supp. 3d 1172, 1180 (D. Ariz. 2020) (quoting

14   A.R.S. § 23-1022(B); citing *McKee v. State*, 241 Ariz. 377, 388 P.3d 14, 19 (Ariz. Ct. App.

15   2016) ("There must be deliberate intention as distinguished from some kind of intention

16   presumed from gross negligence."); *Allen v. Sw. Salt Co*., 718 P.2d 1021, 1024 (Ariz. Ct.

17   App. 1986) ("[T]here must be a genuine intentional injury, comparable to an intentional

18   left jab to the chin.") (emphasis added)).

19           Plaintiff has not specifically argued that the willful misconduct exception applies.

20   (*See* Doc. 82 at 23–25). While she has alleged that Defendants conduct was "intentional,"

21   (Doc. 1 at ¶ 54) she has not alleged that any of the conduct was intended to injure her.

22   *Perkins*, 507 F. Supp. 3d at 1180. Even viewing the evidence in a light most favorable to

23   Plaintiff, as the Court must, she has not set forth "specific facts showing that there is a

24   genuine issue for trial." *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e).

25           This burden is high. So high, that no Plaintiff has overcome it in the last one-

26   hundred years. Consequently, Plaintiff cannot overcome this burden when she has not

27   argued the exception applies or that the conduct which caused her injuries went beyond

28   grossly negligent behavior. Moreover, Plaintiff's NIED claim cannot proceed against

Defendant Bales in his individual capacity either because Section 23-1022 mandates that worker's compensation is the "exclusive remedy against the employer or any ***co-employee*** acting in the scope of his employment." A.R.S. § 23-1022(A) (emphasis added). Plaintiff herself argues that Defendant Bales was her "colleague" in attempting to support her discrimination claim (Doc. 82 at 16), but she does not argue that he was ***not*** acting in the scope of his employment, even when engaging in the alleged injurious conduct (*Id.* at 24). Thus, the Court must enter summary judgment in Defendants' favor on Plaintiff's NIED claim. *See Celotex*, 477 U.S. at 322–23; Fed. R. Civ. P. 56(a).

### F.    Count VII - Retaliation under the Family Medical Leave Act

Defendants also seek summary judgment on Plaintiff's FMLA retaliation claim. (Doc. 81 at 19). They argue that Plaintiff's claim "is a claim for FMLA *interference*, not FMLA retaliation" and that she hasn't presented any evidence that she opposed any practice made unlawful by the FMLA. (*Id.*) Plaintiff alleges that she has demonstrated a retaliation claim because she has presented evidence that she "returned from FMLA leave to vastly different circumstances than those which preceded her leave." (Doc. 82 at 25). The Court agrees with Defendants.

To establish a *retaliation* claim under the FMLA, a plaintiff must show that: (1) she took or requested protected leave; (2) the employer subjected her to an adverse employment action; and (3) the requesting or taking of protected leave was a "negative factor in the adverse employment decision. *Munger v. Cascade Steel Rolling Mills, Inc*., 544 F. Supp. 3d 1078, 1091 (D. Or. 2021), *aff'd*, 2023 WL 128616 (9th Cir. Jan. 9, 2023) (citation omitted). To sustain a FMLA *interference* claim, however, "the employee must establish that: '(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) *his employer denied him FMLA benefits to which he was entitled*.' " *Id*. (quoting *Escriba v. Foster Poultry Farms, Inc*., 743 F.3d 1236, 1243 (9th Cir. 2014) (emphasis added)).

Prohibited acts under Section 2615(a) fall into two general categories: "(1)

retaliation or discrimination claims under Section 2615(a)(2); and (2) interference claims under Section 2615(a)(1)." *Martin v. Arise Inc*., 2023 WL 4237332, at *9 (D. Ariz. June 28, 2023) (citing *Latif v. M & C Hotel Interests, Inc*., 2012 WL 893729, at *3 (C.D. Cal. Mar. 14, 2012)). The Ninth Circuit delineated the applicable standards for retaliation claims versus interference claims in *Bachelder v. Am. W. Airlines, Inc*., 259 F.3d 1112 (9th Cir. 2001). There, it clarified that the plaintiff's claim was one for interference under Section 2615(a)(1), not for retaliation or discrimination:

> [Plaintiff's] claim does not fall under the "anti-retaliation" or "anti-discrimination" provision of § 2615(a)(2), which prohibits "discriminat[ion] against any individual for opposing any practice made unlawful by the subchapter"; nor does it fall under the anti-retaliation or anti-discrimination provision of § 2615(b), which prohibits discrimination against any individual for instituting or participating in FMLA proceedings or inquiries. By their plain meaning, the anti-retaliation or antidiscrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1), the provision governing 'Interference [with the] Exercise of rights.

*Id*. at 1124 (internal citations omitted) (alterations in original).

Related to her retaliation claim, Plaintiff alleges that: (1) she "lawfully exercised her right to FMLA leave;" (2) upon returning to work, she was subjected to adverse employment actions; and (3) her use of leave was a "motivating factor" behind the adverse employment actions. (Doc. 1 at ¶¶ 73–75). She argues that "[w]ithin moments of arriving to work on her first day back from leave, [Defendant] Bales bombarded Plaintiff with news that she had been stripped of all duties that effectively allowed her to do her job." (Doc. 82 at 25).

To survive summary judgment, Plaintiff needed to predicate her retaliation claim on allegations that she either: "(1) opposed a practice carried out by Defendants that violated the FMLA; or (2) instituted or participated in FMLA proceedings or inquiries."[4] *Martin*,

---

[4] "Under the FMLA, an employee participates in a proceeding or inquiry when she '(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to [the FMLA]; (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA]; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under [the FMLA].' " *Martin*, 2023 WL 4237332, at *9 (quoting 29 § U.S.C. 2615(b)).

2023 WL 4237332, at *9. She has not done either. Instead, she argues that she received negative consequences because she used FMLA leave—an action which is subsumed by her interference claim. *See Bachelder* 259 F.3d 1112 ("Such action is, instead, covered under § 2615(a)(1), the provision governing 'Interference [with the] Exercise of rights."). The Court will therefore enter summary judgment in favor of Defendants because Plaintiff's FMLA retaliation claim fails as a matter of law. *See Martin*, 2023 WL 4237332, at *9.

### G.  Count VIII - Whistleblowing

Defendants finally argue that Plaintiff has not demonstrated that she was terminated for whistleblowing. (Doc. 81 at 20). Plaintiff argues that her emails to CPI show otherwise. (Doc. 82 at 26).

The Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1051–02, "spells out the public policy of this statute and enumerates the four circumstances under which an employee may bring a wrongful termination action in Arizona." *Galati v. Am. W. Airlines, Inc.*, 205 Ariz. 290, 292, 69 P.3d 1011, 1013 (Ariz. Ct. App. 2003). Relevant here, AEPA protects employees who report violations of Arizona law to their employer's management or other investigative authority. A.R.S. § 23–1501(3)(c)(ii). Specifically, Arizona's whistleblower statute makes it unlawful for an employer to terminate an employee for disclosing that she "has information or a reasonable belief that the employer . . . has violated, is violating or will violate the Constitution of Arizona or the statutes of this state." A.R.S. § 23-1501(c)(ii). To prevail on a whistleblower claim under the AEPA, a plaintiff "must establish: (1) she had information or a reasonable belief that her employer or another employee had violated an *Arizona statute or constitutional provision*; (2) she disclosed the information or belief to an employer or a representative of the employer whom *she reasonably believed* was in a managerial or supervisory position and had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes; and (3) she was terminated because of the first two steps." *Gonzalez v. US Hum. Rts. Network*, 617 F. Supp. 3d 1072, 1082 (D. Ariz. 2022) (quoting

*Denogean v. San Tan Behavioral Health Servs., LLC*, 2017 WL 4922035, *3 (D. Ariz. 2017) (emphasis added)).

To support her whistleblower claim, Plaintiff alleges that she disclosed information that Defendant Concentric was violating the law or constitution of Arizona to a "representative of the employer with the authority to investigate the information and act." (Doc. 1 at ¶¶ 79–80). On November 23, 2021, Plaintiff sent an email from her personal email account to the "whistleblower" email address for the Crisis Prevention Center ("CPI"): whistleblower@crisisprevention.com. (Doc. 81-12 at 2). Defendants characterize CPI as one of their "clients." (Doc. 81 at 20). Plaintiff stated that Concentric was violating CPI's certification procedures by only holding recertification classes and passing them off as certification classes for nurses who had never completed the CPI course. (Doc. 81-12 at 3). On the same day as Plaintiff's termination, a representative from CPI, its General Counsel and Chief Compliance Officer, emailed Plaintiff and told her CPI was investigating the situation. (*Id*. at 2).

The narrow question here, then, is whether CPI qualifies as a "representative of the employer whom [Plaintiff] reasonably believed . . . had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes." *Gonzalez*, 617 F. Supp. 3d at 1082.

In Plaintiff's supplemental responses and objections to Defendants' first set of interrogatories (Doc. 81-2), Plaintiff notes that CPI requires any nurse taking a certification course for the first time to complete a full and complete version of the course, which includes an in-person and hands on portion. (*Id*. at 15–16). While Arizona does not require health care workers to take classes from CPI and CPI is not a government body, Arizona does require health care providers to "implement and maintain a written workplace violence prevention plan." A.R.S. § 36-420.03(A). Section 36-420.03 requires employers to "provide training and education to its health care workers who may be exposed to workplace violence hazards and risks." *Id*. at 36-420.03(D). CPI's website states that it is "the world's leading provider of evidence-based de-escalation training" and that its

programs "equip staff with crisis intervention and de-escalation skills that reduce challenging behavior and help prevent future incidents."[5]  It also has its own whistleblower policy and specifically states that "Business Partners of CPI, including the employees of Business Partners involved in providing services to CPI" are "eligible to use CPI's Whistleblower System to file a Whistleblower Report."[6]

It does not appear that any court in Arizona has defined who a "representative of the employer" is under A.R.S. § 23-1501(c)(ii).  To properly address Plaintiff's claim then, the Court must interpret whether CPI  is a representative of Concentric under the AEPA.  When interpreting a state statute, a federal court "must interpret the law as would the state's highest court."  *Chen v. Sur La Table, Inc.*, 655 F. Supp. 3d 1082, 1087 (W.D. Wash. 2023) (citing  *In re Kolb*, 326 F.3d 1030, 1037 (9th Cir. 2003).  Arizona courts "look first to the plain language of the statute as the most reliable indicator of its meaning.  If the language is clear, [the Court] must follow the text as written without employing other rules of statutory construction."  *State v. Givens*, 76 P.3d 457, 459 (Ariz. Ct. App. 2003) (citations omitted).  Black's law dictionary defines a "representative" as "[s]omeone who stands for or acts on behalf of another."  *Representative*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Black's definition of representative cites the definition for "agent" which it defines as "[s]omeone who is authorized to act for or in place of another; a ***representative***."  *Agent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).

Plaintiff has not  proffered evidence that she believed CPI could act for or in place of Concentric.  She may very well have believed at the time that CPI "had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes."  *Gonzalez v*, 617 F. Supp. 3d at 1082.  But she has not demonstrated that she disclosed the alleged whistleblowing information to her "employer or a representative of the employer."  *Id*.  Without more, Plaintiff's claim fails as a matter

---

[5] Crisis Prevention Institute, *What is CPI Training?* https://www.crisisprevention.com/our-programs/ (last visited Mar. 14, 2025).

[6] Crisis Prevention Institute, *Whistleblower Policy*, 4 https://www.crisisprevention.com/globalassets/pdf/global/legal/en-cpi-whistleblower-policy-2024.pdf  (last visited Mar.  14, 2025).

1    of law.  *See* A.R.S. § 23-1501(c)(ii); *Gonzalez*, 617 F. Supp. 3d at 1082.

2    **IV.    Conclusion**

3          For the reasons stated above, the Court will enter summary judgment for Defendants

4    on Plaintiff's claims for NIED, retaliation, and her whistleblower claim.  It will not enter

5    summary judgment for Defendants on her claims for discrimination, sexual harassment or

6    IIED, however.

7          Accordingly,

8          **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 81) is

9    **GRANTED in part** and **DENIED in part** as follows:

10         (1)    The Motion is granted as to Plaintiff's Count V for Negligent Infliction of

11   Emotional Distress; Count VII for Retaliation in Violation of the FMLA; and Count VIII

12   for Termination in Violation of Public Policy (Whistleblower).  The Motion is otherwise

13   denied.

14         (2)    The remaining claims are Plaintiff's Count I for Failure to Pay Wages against

15   Concentric Healthcare; Count II for Sex-Based Discrimination against Concentric

16   Healthcare, Count III for Sexual Harassment against all Defendants, Count IV for

17   Intentional Infliction of Emotional Distress against all Defendants; and Count VI for

18   Interference in Violation of the FMLA against Concentric Healthcare.

19         **IT IS FINALLY ORDERED** that in light of Plaintiff's remaining claims, the

20   parties are directed to comply with Paragraph 11 of the Rule 16 Scheduling Order

21   (Doc. 49 at 7) regarding notice of readiness for pretrial conference.  Upon a joint request,

22   the parties may also seek a referral from the Court for a settlement conference before a

23   Magistrate Judge.

24         Dated this 24th day of March, 2025.

25

26                                          _____

27                                          Honorable Diane J. Humetewa
                                            United States District Judge

28