**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jenessa Dubey, | No. CV-22-02044-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Concentric Healthcare Solutions LLC, et al., | |
| Defendants. | |

Defendants Concentric Healthcare Solutions, LLC and Robert Bales (collectively, "Defendants") have moved to exclude Plaintiff Jenessa Dubey's ("Plaintiff") expert, Nathaniel Curtis, MBA ("Mr. Curtis"), under Federal Rule of Evidence 702[1] and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). (Doc. 99).[2] The Court will deny the Motion.

**I.   Background[3]**

This case centers around years of Defendant's conduct which Plaintiff alleges created a hostile work environment while she was their employee. (Doc. 94 at 1). Plaintiff worked at Concentric from August 2016 through December 2, 2021—the date she was terminated. (Doc. 81 at 2; Doc. 82 at 7). Plaintiff managed several employees who were responsible for locating and placing healthcare workers with Concentric's clients in

---

[1] Any references to "rules" herein are in reference to the Federal Rule of Evidence, unless stated otherwise.

[2] The *Daubert* Motion is ripe. (Docs. 100–101).

[3] The facts are fully set forth in the Court's MSJ Order and need not be wholly repeated here. (*See* Doc. 94).

Arizona. (Doc. 81 at 2). She faced many alleged mistreatments during her tenure there. (Doc. 94).

In November of 2021, Plaintiff requested and was granted leave under the Family and Medical Leave Act ("FMLA") from November 4th through November 22nd. (Doc. 81 at 6; Doc. 82 at 9). Upon her return, Plaintiff was "bombarded" with changes such as no longer be permitted to recruit and staff nurses on local jobs. (Doc. 82 at 9). The next two days, November 23rd and 24th of 2021, Plaintiff took sick days by texting and calling both Defendant Bales and Ms. Riley. (Doc. 81 at 7; Doc. 82 at 9). Defendant Bales informed Plaintiff that she did not have any Paid Time Off ("PTO"). (*Id.*) Concentric was closed for Thanksgiving and Plaintiff did not show up for work on November 30, December 1, or December 2 and was ultimately terminated. (Doc. 81-8 at 3). Defendants state that Plaintiff did not contact either Defendant Bales or Ms. Riley on any of these days to inform them she would not be at work. (Doc. 81 at 7). Plaintiff states that she provided a doctor's note on November 29th to Defendant Bales and Ms. Riley which "excused her absence through at least 'Thursday or Friday' of that week which would have been December 2 or 3, 2021, *if* the illness had then resolved." (Doc. 82 at 9). She was terminated on December 2nd, however. (Doc. 94 at 1).

Due to the above alleged conduct, including her termination, and other conduct not repeated here, Plaintiff has brought the following claims against Defendants which have survived summary judgment: (1) Failure to Pay Wages; (2) Sex-Based Discrimination in Violation of Title VII; (3) Sexual Harassment in Violation of Title VII; (4) Intentional Infliction of Emotional Distress; and (5) Interference in Violation of the FMLA. (Doc. 1 at ¶¶ 36–83; Doc. 94 at 31).

To support her claimed damages, Plaintiff has retained a damages expert, Mr. Curtis, to calculate her lost earnings resulting from Defendants' actions. (Doc. 100-4 at 4). Now, Defendants seeks to exclude Mr. Curtis from testifying at trial. (Doc. 99).

**II.    Legal Standard**

Rule 702 of the Federal Rules of Evidence tasks the trial court with a special

"gatekeeping" obligation to ensure that any expert testimony provided is relevant and reliable. *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 589 (1999). A qualified expert may testify based on their "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence." Fed. R. Evid. 702(a). An expert may be qualified to testify based on his or her "knowledge, skill, experience, training, or education." *Id*. The expert's testimony must also be based on "sufficient facts or data," be the "product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id*. at 702(b)–(d). "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

*Daubert's* general holding applies to an expert's testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). *Daubert* suggests several factors for courts to consider in discharging its gatekeeping obligation; however, these factors do not apply to testimony that depends on knowledge and experience of the expert, rather than a particular methodology. *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (citation omitted) (finding that *Daubert* factors do not apply to a police officer's testimony based on twenty-one years of experience working undercover with gangs). Furthermore, "[t]he inquiry envisioned by Rule 702" is "a flexible one." *Daubert*, 509 U.S. at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id*. The proponent of expert testimony has the ultimate burden of showing that the expert is qualified and that the proposed testimony is admissible under Rule 702. *See Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). The trial court is vested with broad discretion in deciding whether an expert is qualified to testify. *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir.1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly

erroneous").

That the opinion testimony aids, rather than confuses, the trier of fact goes primarily to relevance. *See Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1161 (D. Ariz. 2014) (citing *Primiono v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401. However, an expert witness, "cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (internal citations omitted); *see also* Fed. R. Evid. 704.

## III.   Discussion

Defendants argue that Mr. Curtis should be excluded under *Daubert* and Rule 702 as: (1) he's not qualified to testify as an expert; (2) his testimony won't help the trier of fact to understand the evidence or to determine a fact in issue; (3) his opinion is based on insufficient facts and data; and (4) his opinion is not based on reliable principles and methods. (Doc. 99 at 1). None of these arguments persuades the Court to exclude Mr. Curtis.

### A.    Mr. Curtis' Expert Report

Mr. Curtis was engaged by Plaintiff to "calculate her lost earnings resulting from Defendants' actions as described in Plaintiffs' complaint." (Doc. 100-4 at 4). He was not engaged to "offer analysis or insights related to liability or causation." (*Id.*)

Mr. Curtis has "over 15 years of experience in providing expert analysis and testimony related to forensic economics, accounting, finance and statistics for judges, juries, arbitrators and mediators." (*Id.*) Specifically, he avers that he has experience investigating "allegations of economic loss related to wrongful terminations and unpaid compensation." (*Id.*) Mr. Curtis also has an MBA, a Master's Degree in Business Administration, and a Bachelor's in "Business Ecology." (*Id.*) He also serves as the Chief Financial Officer of a private engineering firm with over 150 employees based in Arizona. (*Id.*)

1       Mr. Curtis opines that the present value of Plaintiff's lost earnings resulting from
2 Defendants' conduct is approximately $5.4 million as of January 1, 2024, based on
3 documents produced by the parties, and information obtained from research efforts.
4 (*Id*. at 4–5). Mr. Curtis states that he has "calculated the present value of the Lost Earnings
5 by constructing a 'But-For' Scenario that assumes the Bad Acts did not happen and the
6 'Actual' Scenario which models [Plaintiff's] actual compensation after the Bad Acts
7 resulted in her employment separation" and that the "Lost Earnings is the dollar value
8 difference between the But-For and Actual Scenarios." (*Id*. at 5).

      Plaintiff was 36 years old when she was terminated. (*Id*. at 6). Mr. Curtis assumed
that Plaintiff's retirement age would be 62.5 years old, "even though the data shows that
more than 60% of women do not initiate Social Security payments until after age 62." (*Id*.)
So, her remaining work life calculated by Mr. Curtis is a conservative estimate. (*See id*.)
To support his figure of $5,400,000 in lost earnings, Mr. Curtis has also attached various
exhibits to his report. For example, the following exhibit relevant to this Motion:

**Jenessa Dubey v. Concentric HealthCare et al.**      Exhibit E
**Lost Earnings: Present Value Calculation**

| | | | Total Compensation Analysis [4] | | | Discount | As of: 1/1/2024 Present Value Factor [9] | | |
|---|---|---|---|---|---|---|---|---|---|
| Start Date [1] | End Date [2] | Age [3] | But For [5] | Actual [6] | Lost Comp. [7] | Rate [8] | Years | Factor | Present Value |
| 11/22/2021 | 12/31/2021 | 36.5 | $ 41,806 | $ - | $ 41,806 | 0.0% | 2.0 | 1.00 | $ 41,806 |
| 1/1/2022 | 12/31/2022 | 37.5 | 296,444 | 19,904 | 276,539 | 0.0% | 1.0 | 1.00 | 276,539 |
| 1/1/2023 | 12/31/2023 | 38.5 | 302,259 | 29,411 | 272,848 | 0.0% | 0.0 | 1.00 | 272,848 |
| 1/1/2024 | 12/31/2024 | 39.5 | 311,924 | 87,311 | 224,613 | 2.9% | 1.0 | 0.97 | 218,279 |
| 1/1/2025 | 12/31/2025 | 40.5 | 320,974 | 91,676 | 229,298 | 2.9% | 2.0 | 0.94 | 216,531 |
| 1/1/2026 | 12/31/2026 | 41.5 | 330,603 | 96,260 | 234,344 | 2.9% | 3.0 | 0.92 | 215,038 |
| 1/1/2027 | 12/31/2027 | 42.5 | 340,522 | 103,961 | 236,561 | 3.0% | 4.0 | 0.89 | 210,117 |
| 1/1/2028 | 12/31/2028 | 43.5 | 350,401 | 109,159 | 241,243 | 3.0% | 5.0 | 0.86 | 208,014 |
| 1/1/2029 | 12/31/2029 | 44.5 | 361,259 | 113,525 | 247,734 | 3.0% | 6.0 | 0.84 | 207,370 |
| 1/1/2030 | 12/31/2030 | 45.5 | 372,097 | 116,931 | 255,166 | 3.4% | 7.0 | 0.79 | 202,349 |
| 1/1/2031 | 12/31/2031 | 46.5 | 383,260 | 120,439 | 262,821 | 3.4% | 8.0 | 0.77 | 201,625 |
| 1/1/2032 | 12/31/2032 | 47.5 | 395,136 | 124,052 | 271,084 | 3.4% | 9.0 | 0.74 | 201,184 |
| 1/1/2033 | 12/31/2033 | 48.5 | 406,211 | 127,773 | 278,438 | 3.4% | 10.0 | 0.72 | 199,904 |
| 1/1/2034 | 12/31/2034 | 49.5 | 418,397 | 131,607 | 286,791 | 3.4% | 11.0 | 0.69 | 199,189 |
| 1/1/2035 | 12/31/2035 | 50.5 | 431,363 | 135,555 | 295,808 | 3.4% | 12.0 | 0.67 | 198,753 |
| 1/1/2036 | 12/31/2036 | 51.5 | 444,729 | 139,621 | 305,108 | 3.4% | 13.0 | 0.65 | 198,319 |
| 1/1/2037 | 12/31/2037 | 52.5 | 457,633 | 143,810 | 313,822 | 3.4% | 14.0 | 0.63 | 197,333 |
| 1/1/2038 | 12/31/2038 | 53.5 | 471,362 | 148,124 | 323,237 | 3.4% | 15.0 | 0.61 | 196,627 |
| 1/1/2039 | 12/31/2039 | 54.5 | 485,037 | 152,568 | 332,469 | 3.4% | 16.0 | 0.59 | 195,649 |
| 1/1/2040 | 12/31/2040 | 55.5 | 500,067 | 157,145 | 342,922 | 3.4% | 17.0 | 0.57 | 195,222 |
| 1/1/2041 | 12/31/2041 | 56.5 | 515,069 | 161,860 | 353,210 | 3.4% | 18.0 | 0.55 | 194,523 |
| 1/1/2042 | 12/31/2042 | 57.5 | 530,522 | 166,715 | 363,806 | 3.4% | 19.0 | 0.53 | 193,827 |
| 1/1/2043 | 12/31/2043 | 58.5 | 546,437 | 171,717 | 374,720 | 3.4% | 20.0 | 0.52 | 193,133 |
| 1/1/2044 | 12/31/2044 | 59.5 | 562,830 | 176,868 | 385,962 | 3.4% | 21.0 | 0.50 | 192,442 |
| 1/1/2045 | 12/31/2045 | 60.5 | 579,160 | 182,174 | 396,985 | 3.4% | 22.0 | 0.48 | 191,485 |
| 1/1/2046 | 12/31/2046 | 61.5 | 597,107 | 187,640 | 409,467 | 3.4% | 23.0 | 0.47 | 191,066 |
| 1/1/2047 | 12/31/2047 | 62.5 | 615,020 | 193,269 | 421,751 | 3.4% | 24.0 | 0.45 | 190,383 |
| | | Subtotal | $ 11,367,629 | $ 3,389,075 | $ 7,978,554 | | Present Value of Lost Wages | $ | 5,399,553 |
| | | | | | | | Rounded | $ | 5,400,000 |

(Doc. 100-4 at 14). This exhibit shows Plaintiff's "compensation analysis" under Mr. Curtis But For and Actual scenarios as calculated through 2047. (*See id*). Defendants' expert, Brent H. Taylor, criticized Mr. Curtis report, stating that:

> [Plaintiff's] commissions increased significantly during 2020 and 2021. Since the Curtis Report uses these commissions to project 26 years of future commissions, it is important to understand why [Plaintiff's] commissions increased to evaluate whether it is reasonable to assume this level of commissions would continue and grow for 26 more years. However, we see no evidence that Mr. Curtis performed this analysis. Instead, Mr. Curtis notes in his report that [Plaintiff's] counsel informed him that commissions were $17,000 per month. Mr. Curtis simply accepts this amount, without performing any analysis or verification to assess the reasonableness of this assumption, to calculate 2021 and 2022 commissions, and then grows this amount at an annual rate of 2% (2023) and 3% (2024 and beyond) for the next 26 years
>
> . . .
>
> [Plaintiff] was in charge of staffing per diem nurses for various healthcare organizations. [The Covid pandemic] resulted in major nursing staffing shortages for healthcare organizations, which led to major increases in the demand for nursing staff. Organizations like Concentric saw significant revenue growth as the demand for nursing staff increased, and hourly rates Concentric charged for its nursing staff increased substantially. These increases led to [Plaintiff] receiving commissions at levels she never earned in the three years leading up to the pandemic beginning in 2020. Mr. Curtis's assumption that [Plaintiff's] commissions would continue at pandemic levels for 26 years into the future is both unreasonable and unsupported.

(Doc. 99-5 at 3–4). Mr. Taylor prepared his own chart to "correct" Curtis' calculations:

**Table 3: Commission Calculations**

| Actual/Expected Commissions | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 [1] | 2023 [1] | 2024 [2] |
| $23,016 | $32,204 | $38,371 | $94,961 | $158,316 | $190,699 | $121,248 | $46,164 |

[1] Calculated based on Ms. Dubey's November 18, 2019 Promotion Letter.
[2] Calculated based on Ms. Dubey's November 18, 2019 Promotion Letter through August 2024 and annualized through December 2024.

(*Id*. at 4). He states that "it is clear that the COVID-19 pandemic lead to increased

commissions for [Plaintiff] during 2020 and 2021. However, by 2024, [Plaintiff's] commissions would have returned to levels resembling those before the COVID-19 pandemic." (*Id*.)  He also states that Mr. Curtis failed to consider this trend and the associated impact when performing his damages calculations which results in significantly overstated "lost earnings." (*Id*.)

In his rebuttal report, Mr. Curtis states that he "consider[ed] all available information concerning mitigating damages" and that he did not rely on Plaintiff's counsel or Plaintiff herself to calculate her historical or future mitigating income. (Doc. 99-6 at 4). He also states that his report and Mr. Taylor's "use different sources to estimate [Plaintiff's] remaining expected work life, should the trier of fact decide that 61.5 years is the appropriate expected work life, the Curtis Report Lost Earnings decreases by approximately $190,000." (*Id*. at 5).  Mr. Curtis further states that "[t]he relevant issue is [Plaintiff's] earning capacity as a professional, not her earning capacity at Concentric. A Lost Earnings damage model follows the individual's career trajectory not their former employer's position." (*Id*.)  The Court also notes that Mr. Curtis relied on various sources in writing his report, such as check stubs and an offer letter from "Wayward." (Doc. 100-4 at 11).

### B. Mr. Curtis is Qualified under Rule 702

The Court will first address Defendant's argument that Mr. Curtis is not qualified to testify under Rule 702's baseline requirements. (Doc. 99 at 11).  The Court finds that he is.

Rule 702 states that a witness may be qualified to testify as an expert through "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  "Rule 702 'contemplates a broad conception of expert qualifications' and is 'intended to embrace more than a narrow definition of qualified expert.' " *Magallon v. Robert Half Int'l, Inc*., 743 F. Supp. 3d 1237, 1242 (D. Or. 2024) (quoting *Thomas v. Newton Int'l Enters*., 42 F.3d 1266, 1269 (9th Cir. 1994)).  A witness "may be qualified as an expert upon demonstrating at least a '*minimal foundation* of knowledge, skill, and experience.' " *Id*.

*Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (emphasis in original). "Years of relevant experience can establish the necessary 'minimal foundation.'" *Unknown Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702, 707 (D. Ariz. 2022) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004)).

Under *Daubert*, the district judge is "a gatekeeper, not a fact finder." *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony. *See Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Unknown Party*, 641 F. Supp. 3d at 707 (quoting *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998)).

The Court finds that Mr. Curtis is qualified to testify as an economics expert through his experience and through his education. Fed. R. Evid. 702. First of all, Mr. Cutis holds an MBA in Business Administration and a Bachelor's in Business Ecology. This helps him meet the minimum threshold to be qualified under Rule 702 as he has relevant education credentials. *Primiano*, 598 F.3d at 564–65. Furthermore, he has more than a decade of experience providing expert analysis in this sort of case (Doc. 100-4 at 4). *See Unknown Party*, 641 F. Supp. 3d at 707 ("Years of relevant experience can establish the necessary 'minimal foundation.'"). Thus, as a threshold matter, Mr. Cutis meets the minimum requirements to testify as an expert and the Court will not exclude him at this pretrial stage. *Magallon*, 743 F. Supp. 3d at 1242 ("Rule 702 'contemplates a broad conception of expert qualifications' and is 'intended to embrace more than a narrow definition of qualified expert.'"). Of course, Defendants may renew any objection under Rule 702 as to Mr. Curtis' testimony at trial.

**C.  Whether Mr. Curtis Testimony Will Assist the Jury**

Defendants next argue that Mr. Curtis' opinions about lost earning capacity aren't helpful to the jury because Plaintiff doesn't claim her earning capacity was damaged.

(Doc. 99 at 9). Plaintiff argues that Mr. Curtis only intends to testify at trial regarding the amount of Plaintiff's lost future earnings because of her wrongful termination by Concentric. (Doc. 100 at 7). Plaintiff clarifies that "[i]n other words, Mr. Curtis is not offering an opinion as to why Plaintiff's compensation will not reach previous levels, but instead he is simply using that fact — supported by other evidence — as a reasonable assumption when performing his calculations." (*Id*. (citing *Nelson v. Costco Wholesale Corp*., 2022 WL 1638838, at \*3 (D. Ariz. May 24, 2022) ("Plaintiff's earning capacity, absent his injury, was $20,000 a year. [The expert] did not come up [with] these assumptions himself; instead, he relied on Plaintiff's disclosures and on record evidence")).

Expert knowledge assists the trier of fact "when it provides knowledge beyond the trier of fact's common knowledge." *In re Apollo Grp. Inc. Sec. Litig*., 527 F. Supp. 2d 957, 961–62 (D. Ariz. 2007) (citation omitted). "Conversely, expert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people, because it would not assist the trier of fact in analyzing the evidence." *Id*.

In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." *Id*. (quoting *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986)). Likewise, "unreliable and unfairly prejudicial expert witness testimony is not helpful to the trier of fact, the trial court should exclude such evidence." *Id*. (citing *Jinro Am., Inc. v. Secure Invs., Inc*., 266 F.3d 993, 1004 (9th Cir. 2001).

It appears that there is a disconnect between the parties on Mr. Curtis' intended testimony. Mr. Curtis states in his report that he was engaged to "calculate [Plaintiff's] lost earnings resulting from Defendants' actions as described in [her] complaint." (Doc. 100-4 at 4). At his deposition, Mr. Curtis was asked about the following statement: "[t]he relevant issue is [Plaintiff's] earning capacity as a professional, not her earning capacity at Concentric." (Doc. 100-2 at 26). When asked why her earning capacity is not relevant at Concentric, Mr. Curtis replied: "It's not that it's not relevant. It's not the goal. The goal isn't to say what she would have earned at Concentric. It's to understand what

her earnings capacity was." (*Id*. at 27).

The Court finds that Mr. Curtis testimony will aid the jury because he will provide "knowledge beyond the trier of fact's common knowledge." *In re Apollo Grp.*, 527 F. Supp. 2d at 961–62. Defendants' arguments go to the weight of Mr. Curtis testimony and the evidence supporting it—not its admissibility. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.") (citations omitted). So, this argument also fails.

### D. Sufficient Facts and Data

Defendant next argues that Mr. Curtis testimony relies on insufficient facts and data in violation of Rule 702(b). (Doc. 99 at 15). Plaintiff argues that "[e]ach of Mr. Curtis's specific opinions are backed up by facts, data, or reasonable assumptions the expert chose to make based on Mr. Curtis's experience." (Doc. 100 at 10). The Court agrees with Plaintiff.

Consistent with the court's gatekeeping functions, Rule 702 instructs a district court to "determine whether an expert had sufficient factual grounds on which to draw his conclusions." *Elosu*, 26 F.4th at 1025-26. A court may conclude there is "simply too great an analytical gap between the data and the opinion proffered, but Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id*. (citation and internal quotation marks omitted). Rather, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof." *Primiano*, 598 F.3d at 564. Experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592–93.

"An expert may rely on assumptions when formulating opinions." *Petersen v. United States*, 2024 WL 1116161, at *3 (D. Idaho Mar. 14, 2024) (citing Fed. R. Evid. 702,

- 10 -

advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence.")); *see also Elosu*, 26 F.4th at 1025–26 ("[T]he requirement of 'sufficient facts or data' does not preclude an expert from making projections based on reliable methodology."). "Generally, a disagreement with an expert's assumptions does not provide a basis for excluding his testimony." *Id*.

The Court finds that Mr. Curtis opinions are drawn from sufficient factual grounds. *Elosu*, 26 F.4th at 1025–26; Fed. R. Evid. 702(b). Mr. Curtis states in his report that, in developing his opinions, he reviewed documents produced by the parties, and information obtained from research efforts related to this report. (Doc. 100-4 at 4). Mr. Curtis has also included an exhibit detailing the documents he relied upon which includes check stubs and an offer letter. (*Id*. at 11). Plaintiff also notes in her Response that Mr. Curtis relied upon records of Plaintiff's historical compensation and commissions and data regarding compensation conditions in the specific industry at the relevant time. (Doc. 100 at 10). She also argues that Defendant's expert also relied upon these same documents to reach his opinion. (*Id*.) Defendants argue in their Reply that Mr. Curtis "only reviewed two commission payments to predict Plaintiff's commissions for the remainder of her career" and that this limited review of two commission payments "is insufficient to predict almost 25 years of commissions." (Doc. 101 at 6).

Defendant essentially argues that Plaintiff's commission payments and wage data were reviewed in a vacuum. Yet, according to Mr. Curtis, they were reviewed in conjunction with other documents, evidence and statistics from the Bureau of Labor. (Doc, 100-4 at 4–6, 11). Mr. Cutis then utilized these facts, data and assumptions to reach a conclusion as to Plaintiff's lost wages. These facts and data, reviewed in the aggregate, establish sufficient factual grounds from which Mr. Curtis could form an opinion and draw conclusions from. *Elosu*, 26 F.4th at 1025-26. Any alleged insufficiency can be attacked by cross examination, contrary evidence, and attention to the burden of proof—but exclusion is not the appropriate remedy here. *See Primiano*, 598 F.3d at 564.

**E.     Reliable Principals and Methods**

Finally, Defendant argues that Mr. Curtis' opinions regarding Plaintiff's future earning capacity and expected growth rate in the "Actual Scenario" employs an unreliable methodology. (Doc. 99 at 16). The Court disagrees.

Rule 702(c) requires an expert's testimony be "the product of reliable principles and methods." Fed. R. Evid. 702(c). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564. A court may conclude there is "simply too great an analytical gap between the data and the opinion proffered, but Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1025-26 (citation and internal quotation marks omitted). "For a court to meaningfully assess whether an expert's methods and application have been reliable, the expert must adequately detail his methods and explain why the methods he employed compelled the conclusions he reached in light of the facts of the case." *Nelson v. Costco Wholesale Corp.*, 2022 WL 1638838, at *2 (D. Ariz. May 24, 2022) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).

The Court's responsibility is to "ensure that a sufficiently qualified expert applied reliable principles to form their hypothesis—not to gauge whether that hypothesis is ultimately correct. That is for the litigants to prove, and for the factfinder to decide." *Elosu*, 26 F.4th at 1029. Each expert opinion "must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Petersen*, 2024 WL 1116161, at *3 (citations omitted). The trial court should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

As discussed, Mr. Curtis employed a But-For Scenario and an Actual Scenario to calculate Plaintiff's damages. (Doc. 100-4 at 5). Mr. Curtis states that the Actual Scenario:

- 12 -

> [U]tilizes [Plaintiff's] actual earnings after she started FMLA. This Scenario assumes that [Plaintiff's] efforts to obtain and maintain employment are a reasonable estimate of her earnings capacity after the Bad Acts. The Actual Scenario differs from the But-For Scenario by assuming that [Plaintiff] will experience abnormal wage increases and commission increases in her new position because workers commonly experience several years of above average earnings increases when they pursue long-term and stable employment. As shown in Exhibit D, even after assuming that [Plaintiff] will experience greater than average wage and commission increases in her new job, it is not possible for her to catch up to the earnings capacity she experienced at Defendant's office.

(*Id*. at 5–6). Exhibit D calculates Plaintiff's total compensation through 2047 at $3,389,075. (*Id*. at 13).

Mr. Curtis also stated in an affidavit submitted with Plaintiff's Response that "with respect to the Plaintiff's lost commissions, I reviewed Plaintiff's pay stubs, which revealed commissions in September 2021 of $16,308 and in October 2021 of $18,011. Using historical earnings, and specifically recent historical earnings, is a generally accepted and testable data source used by experts to calculate lost earnings in wrongful termination disputes." (Doc. 100-3 at 2–3). Curtis also details that Defendants' expert relied on the same information in the present matter. (*Id*.) Mr. Curtis further states that:

> I also reviewed the specific circumstances surrounding Plaintiff and her termination. For example, despite Defendants' argument to the contrary, the data I relied upon accounted for the impact of COVID-19, and I factored this analysis into my projections for future earnings. The data I reviewed also showed that, following the COVID nursing shortage, compensation for placement professionals specializing in health care did slow down, but it never declined — a fact not disputed by Defendants. In fact, ***compensation for placement professionals in the health care industry has gone up every single quarter and year since late 2020***.

(*Id*. at 3).

Defendants take issue with Mr. Curtis earning capacity growth and commission calculations. (Doc. 99 at 16–18). They argue that Mr. Curtis did not take Plaintiff's specific job into consideration in determining what rate was appropriate. (*Id*. at 16). They also argue that Mr. Curtis' does not provide a basis for his assumption of a 10% yearly

- 13 -

commission. (*Id*. at 18). However, an expert "may, in appropriate circumstances, rely on assumptions when formulating opinions." *Unknown Party*, 641 F. Supp. 3d at 727 (citing Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence.")). Furthermore, "[d]isagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony." *Id*. (citing *Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to [the expert's] opinions and the weaknesses in his assumptions are issues to be explored on cross-examination.")).

Here, Mr. Curtis' opinions are the product of reliable principles and methods such that he can testify under Rule 702. Fed. R. Evid. 702(c). Mr. Curtis avers that his methodology is "a standard, accepted way for performing damages calculations in cases claiming lost future wages." (Doc. 100-3 at 3). Mr. Curtis has also detailed his methods and has explained why the methods he employed compelled the conclusions he reached. *Nelson*, 2022 WL 1638838, at *2. For instance, he stated in his report that "Wages for employment services professionals spiked by 7.3% in 2021 and an additional 9.1% in 2022. These levels of wage growth are not sustainable . . . The Actual Scenario uses a higher wage growth rate from 2024 to 2034 before reverting to the long-term expected wage growth rate of 3%." (Doc. 100-4 at 6).

The Court, in reviewing Mr. Curtis methodology, finds that it is sound such that it should be attacked by cross examination at trial—not exclusion beforehand. *See Primiano*, 598 F.3d at 564. Mr. Curtis has applied reliable principles to form his hypothesis. It is not for the Court to gauge whether that hypothesis is ultimately correct, so long as his opinion stays "within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Petersen*, 2024 WL 1116161, at *3 (citations omitted); *Elosu*, 26 F.4th at 1029. In sum, the Court will not exclude Mr. Curtis at this juncture given that his opinions are merely impeachable. *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969.

/ / /

Accordingly,

**IT IS ORDERED** that Defendants' *Daubert* Motion (Doc. 99) is **DENIED**.

Dated this 12th day of June, 2025.

Honorable Diane J. Humetewa
United States District Judge